**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Connisha Butler,

    *Plaintiff,*

v.

Ford Motor Company and
Stephan Malloy,

    *Defendants*

No. 21 CV 1244

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Connisha Butler ("Plaintiff" or "Butler") brings suit against Ford Motor Company ("Ford") for sex discrimination (Count II) and retaliation (Count III) in violation of the Illinois Human Rights Act ("IHRA"). Plaintiff also brings suit against her former co-worker Stephan Malloy ("Malloy") for common law assault (Count V) and violation of the Illinois Gender Violence Act ("IGVA") (Count VI). [See Dkt. 1-1 at 12-33.][1] Currently before the Court is Ford's motion for summary judgment [Dkt. 75]. The motion is granted. Judgment is entered in favor of Ford and against Plaintiff on Counts II and III of Plaintiff's complaint.

## I.    Background

The following facts are taken from Ford's and Plaintiff's Local Rule 56.1 statements and the exhibits filed with them. [See Dkts. 77, 78, 80, 85-1, 85-1, 91.] These facts are undisputed except where a dispute is noted. Ford manufactures motor

---

[1]    On September 23, 2022, the Court granted Defendant's motion to dismiss Plaintiff's claims for IHRA sexual harassment (Count I), intentional infliction of emotional distress (Count IV), as well as Plaintiff's IGVA claim to the extent that claim was brought against Ford. [See Dkt. 68.]

vehicles, including at its Chicago Assembly Plant ("CAP") in Chicago, Illinois.[2] Ford's collective bargaining agreements with the United Auto Workers union ("UAW") govern the terms and conditions of employment between Ford and hourly production workers at CAP.

CAP employs at least two categories of hourly employees. Hourly employees with the classification of "In Progression" are considered "full-time seniority employees." [Dkt. 85-2, ¶ 6.] By contrast, Short-Term Supplemental ("STS") hourly employees are considered temporary employees. [Id., ¶ 8.] They supplement the regular vehicle assembly workforce for defined periods of time and do not have the same rights as seniority employees under the collective bargaining agreements. [Id. ¶ 9.] STS employees are expected to maintain exemplary attendance and behavioral records. Unlike In Progression employees, STS employees are subject to termination without following progressive discipline, regardless of the offense. [Id., ¶ 10.][3]

Plaintiff is a female living in Chicago. She was employed at Ford CAP from September 17, 2018 through December 20, 2018, during a temporary layoff from her regular employer, Tootsie Roll. During this period, Malloy, an African American male, worked at CAP as an hourly In Progression employee. A female co-worker, who the parties both refer to as the "Female Co-Worker," was also an hourly In

---

[2]    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because, at the time of removal, there was complete diversity among the properly joined parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is appropriate because the allegations in Plaintiff's complaint are alleged to have occurred in the Northern District of Illinois, Eastern Division.

[3]    Plaintiff does not dispute any of these differences between STS and In Progression employees, but asserts that she was not made aware of and did not understand Ford's policies. [See id., ¶¶ 8-10.]

Progression employee. Malloy and the Female Co-Worker were both "full-time seniority employees." [Dkt. 85-2, ¶ 6.] Plaintiff, by contrast, was a temporary "STS" hourly employee. [Dkt. 85-2, ¶ 8.][4] Malloy has no control over Plaintiff's employment status. [Dkt. 91-3 at 10 (Tr. 113:6-9).]

Ford has an anti-harassment policy, on which Plaintiff received training. Plaintiff acknowledges that she received copies of Ford's All Employee Bulletin on anti-harassment and Ford's Anti-Harassment Policy, and also reviewed and understood those policies. [Dkt. 85-2, ¶ 12.] Plaintiff understood that Ford's policy prohibited harassment of any kind and that a violation of the Anti-Harassment Policy could result in discipline, including discharge. [*Id.* ¶ 13; see also Dkt. 78-7 at 17.]

On December 11, 2018, Plaintiff was working on the assembly line while talking with the Female Co-Worker, who was sitting at Plaintiff's workstation while on a break. Malloy approached and attempted to ask Plaintiff if her name was on an attendance sheet for overtime on the previous Sunday. Plaintiff couldn't hear Malloy, who was on the other side of the assembly line. Once the line stopped, Plaintiff crossed over to Malloy's side so she could hear him and asked what he was saying. According to Plaintiff, Malloy told her, "No, your name is not on the list," and pointed his finger in her face for about a second and told her to go back on the line where she worked. [See Dkt. 85-2, ¶ 15.] Plaintiff testified that Malloy "pointed as if [she] was an animal,

---

[4]      Plaintiff does not dispute this, but maintains that she did not understand that it was a temporary position. [See *id.*] According to Plaintiff, she was told that she would be eligible for continuing employment after ninety days, but Ford points out that the Collective Bargaining Agreement provides that STS employees must work for a "continuous period of more than one year" to gain seniority. [Dkt. 91, ¶ 25.]

or something, instead of talking to [her] like an adult, and not like his child." [*Id.*; see also *id.*, ¶16.] Plaintiff told Malloy that she felt disrespected. Malloy responded: "You bitches on this line be tweaking." [*Id.*,¶ 17.] Plaintiff interpreted "bitches" to be referring to both her and the Female Co-Worker. [See Dkt. 78-7 at 31 (Tr. 103:10-16).] The three had a "heated argument," during which Plaintiff admittedly called Malloy a "bitch" and an "asshole." [*Id.* at 31-32 (Tr. 103:19-104:4); see also Dkt. 85-2, ¶ 21; Dkt. 91, ¶ 14.]

Plaintiff moved back across the assembly line to her side. Malloy said, "come March" or "after shutdown," Plaintiff "won't even have a job." [Dkt. 91, ¶ 15.] According to Plaintiff, Malloy also threatened that he would get his girlfriend (who also worked at CAP) to slap Plaintiff; Malloy denies this. [See *id.*] According to an interview with Malloy's girlfriend, Plaintiff kept trying to charge toward Malloy, while Plaintiff's friends were "pushing [Plaintiff] back to her job." [Dkt. 80 at 84.] And according to Plaintiff, another female co-worker was "trying to pull [Malloy] off the line." [*Id.* at 25.]

The entire encounter lasted less than a minute. [Dkt. 85-2, ¶ 22.] Plaintiff continued performing her job for the rest of the day and did not miss any work. [*Id.*, ¶ 23.] According to Plaintiff, she did not have any additional encounters with Malloy and did not experience any other incidents of alleged harassment at Ford (though her employment was soon to end). [*Id.*, ¶ 24; see also Dkt. 78-7 at 35 (Tr. 111:1-7).]

The day after the incident, December 12, 2018, Plaintiff and the Female Co-Worker went to CAP Labor Relations to complain about their encounter with Malloy.

4

This was against the advice of their union representative, who told Plaintiff that if she went to Labor Relations, things may not turn out the way she wanted, which Plaintiff took to mean that she might get in trouble for her conduct. [See Dkt. 91, ¶ 22.] Labor Relations serves the human resources function for hourly personnel at CAP. Briana Bryant ("Bryant") was the Labor Relations Representative at this time. Her job duties included conducting investigations into complaints made by hourly employees at CAP. She also had authority to issue discipline to hourly employees. Annita O'Connor ("O'Connor") was the COE Senior Specialist in People Matters, which is a corporate human resources function. As part of her job duties, O'Connor oversaw certain types of investigations arising out of CAP, including cases of harassment, discrimination, or retaliation.

Bryant took statements from Plaintiff and the Female Co-Worker and began an investigation. In her signed statement dated December 12, 2018, Plaintiff reported that Malloy put his hands in her face, "pointing, saying 'Ok, you can go back over there, your job is over there,'" and then said, "Y'all bitches down this line tweaking." [Dkt. 85-2, ¶ 30.] Plaintiff testified she never heard Malloy threaten to slap her. [Dkt. 78-7 (Tr:33:20-22).] The Female Co-Worker also provided a signed statement and reported that Malloy called her a "bitch" and threatened to slap her. [Dkt. 85-2, ¶ 32.]

Bryant interviewed Malloy on December 13, 2018. He provided a signed statement in which he denied calling Plaintiff and the Female Co-Worker "bitches" and denied stating that he was going to slap either of them. [Dkt. 85-2, ¶ 33.] Malloy also reported that during the encounter, Plaintiff said to Malloy, "What the fuck are

you looking at?"; "What the fuck you come down here for?"; she referred to Malloy's girlfriend as a "bitch;" and that she used the n-word in reference to Malloy. [*Id.*, ¶ 34. ("Yea, you like to argue with girls. I was just playing with you. That's a bitch ass n[*] move. Go get your bitch.").] Malloy further reported that Plaintiff "walked up, put her fingers in [his] face, [and] kept yelling." [*Id.*]

Bryant interviewed several other employees who had witnessed the incident and took their written statements. On December 18, 2018, she interviewed AH, an hourly employee. In a signed statement, AH reported witnessing Plaintiff cursing and using the n-word in reference to Malloy. [Dkt. 85-2, ¶ 36.] Plaintiff denies using such words and denies putting her fingers in Malloy's face, but she acknowledges calling Malloy "bitch" and "asshole." [See *id.*] Bryant also interviewed another hourly employee, TG, on December 12, 2018. In a signed statement, TG reported witnessing Plaintiff tell other employees about the incident with Malloy. [*Id.*, ¶ 37.]

Bryant prepared a summary of her investigation. According to the investigation summary, witnesses confirmed that Plaintiff engaged in inappropriate behaviors, cursed, and referred to Malloy using the n-word. [Dkt. 85-2, ¶ 40.] Witnesses also confirmed that Plaintiff pointed her fingers in Malloy's face and made references to "I got somebody for you" and that she would "have someone come up here for him." [*Id.*] Plaintiff denies that any of this occurred. [Dkt. 91, ¶¶ 19-20.] According to the investigative summary, witnesses also confirmed that Malloy had cursed at both Plaintiff and the Female Co-Worker and threatened to slap the Female Co-Worker. [Dkt. 85-2, ¶ 42.]

On December 21, 2018, Bryant issued discipline to all three employees—Plaintiff, Malloy, and the Female Co-Worker. Plaintiff was discharged for violating Ford's Anti-Harassment Policy, as reflected on a Termination slip and Disciplinary Action Report (4600) prepared by Bryant. [Dkt. 85-2, ¶ 43.] Bryant charged Plaintiff with the offense of 'Anti-Harassment-Race' because witnesses confirmed Plaintiff's use of the n-word in reference to Malloy, who is African American. Plaintiff asserts that this given reason was pretextual and that the real "reason that she was discharged was because of her sex and in retaliation for a protected activity." [*Id.*]

The Female Co-Worker was given a one-day suspension for Improper Conduct to Fellow Employee. Bryant testified that she chose not to charge the Female Co-Worker with an Anti-Harassment violation, like she charged Plaintiff, because her assessment was that the Female Co-Worker did not use profanity "based on sex or race." [Dkt. 85-2, ¶ 49.]  In Plaintiff's view, she and the Female Co-Worker "engaged in the same behavior, but Plaintiff received a different penalty." [*Id.*]

Malloy was given a 30-day suspension for Act of Threat. Bryant explained at her deposition that Malloy received this charge, rather than some other potentially applicable offense, because Act of Threat was considered the highest penalty charge of the offenses he committed. [Dkt. 85-2, ¶ 47.] O'Connor's declaration states that she also believed Malloy's conduct more closely resembled profanity and threats rather than acts of a sexual manner.

Prior to this incident, Malloy had been issued disciplinary action reports for "disrespect" toward supervisors/proper authority, including reports that he cursed

and, on one occasion, slammed parts on the ground. [Dkt. 91, ¶ 3.] One such incident occurred on December 11, 2018 (ten days before the incident with Plaintiff), resulting in an altercation between Malloy and a different female co-worker. [See *id.*, ¶¶ 3, 9.] Although Malloy disputed aspects of the allegations made by that co-worker regarding the incident, the co-worker reported that Malloy threatened to "slap the shit" out of her. [*Id.*, ¶ 6.]

Bryant testified that when determining the level of discipline or penalty to administer for this investigation, she took into account the levels of discipline that had been issued to other hourly employees for the same offense names. [Dkt. 85-2, ¶ 51.] In her investigative summary, Bryant included three charts of potential comparators. All were Ford hourly employees who had been charged with the offense names of (1) "Act of Threat," (2) "Improper Conduct/Disrespect to a Fellow Employee," and/or (3) "Anti-Harassment-Race/Discrim/Retal." [*Id.*, ¶ 52.] Bryant testified that the discipline she administered was consistent with the levels of discipline previously administered to other employees who had been charged with the same offense names. [*Id.*, ¶ 53.]

In is undisputed that because Plaintiff was an STS employee—unlike Malloy and the Female Co-Worker, who were In Progression employees—Plaintiff was not entitled to progressive discipline and could be discharged for a first offense, regardless of the offense type. [Dkt. 85-2, ¶ 54.] Plaintiff acknowledged at her deposition, "there really wasn't nothing else that anybody [could] do with [her] being an STS employee." [Dkt. 85-2, ¶ 55.] Plaintiff also acknowledged that calling someone

the n-word, "asshole," or "bitch" at work would be grounds for termination. [Dkt. 85-2, ¶¶ 57-58 (citing Dkt. 78-7 at 30 (Tr. 102:7-18).]  Further, Plaintiff acknowledged that, considering the witness statements obtained during the investigation, some form of discipline was warranted. She understood why Ford concluded that she violated the Anti-Harassment Policy, and agreed that was "a reasonable conclusion to draw." [Dkt. 78-7 at 43 (Tr. 146:2-15).]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its

version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

### III.  Analysis

#### A.  Sex Discrimination

In Count II of the complaint, Plaintiff brings a claim for sex discrimination in violation of the IHRA. Illinois courts "have adopted the analytic framework" of Title VII to analyze IHRA claims. *Zaderaka v. Illinois Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. Sup. Ct. 1989); see also *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 547 (7th Cir. 2017); *Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016). Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII if it "intentionally relies in part" on an individual employee's membership in a protected class when the employee makes an adverse employment decision. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741, -- U.S. -- (2020). Put differently, "if changing the employee's" sex or other protected characteristic "would have yielded a different choice by the employer," then "a statutory violation has occurred." *Id*.

In this case, the parties agree that Plaintiff is a member of a protected class based on her sex—female—and that Plaintiff suffered an adverse employment action—termination. The parties dispute only causation. At summary judgment, the question is "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] caused the discharge or other adverse employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); see also *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022); *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). Plaintiff can establish causation using the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or in a holistic manner under *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016). See *Riley*, 829 F.3d at 891-92.

### 1. *McDonnell Douglas*

In their briefs, both parties analyze the case under the *McDonnell Douglas* burden shifting framework, which is intended to "'clarify and simplify'" the task of

proving causation. *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). [See Dkt. 76 at 7-13; Dkt. 85 at 7-10.] Under this framework, the plaintiff has the "initial burden to establish a *prima facie* case of discrimination" by showing that 1) she is a member of a protected class; 2) she was meeting her employer's legitimate job expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees outside the protected class were treated more favorably. *Wince*, 66 F.4th at 1040. If the plaintiff meets this burden, the "burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Wince*, 66 F.4th at 1040 (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)).

Only the second and fourth elements of the *prima facie* case are contested here. As to the first element, Ford argues that it had a legitimate, nondiscriminatory reason for terminating Plaintiff: she violated Ford's Anti-Harassment Policy (Race) by directing a racial slur at Malloy. The record supports Ford's argument. After Plaintiff and the Female Co-Worker complained about Malloy, Labor Relations conducted an investigation. Witnesses confirmed that Plaintiff had engaged in inappropriate behavior, including referring to Malloy using the n-word. [Dkt. 85-2, ¶ 40.] Before discharging Plaintiff, Labor Relations Representative Bryant confirmed that the penalty of discharge was consistent with the penalties that had been assessed against other hourly employees charged with a similar offense. [*Id.*, ¶¶ 51-53.] These facts support Ford's position that it had a legitimate, nondiscriminatory

12

reason for terminating her. See *Dickerson v. Walgreen Co.*, 345 F. App'x 178, 180 (7th Cir. 2009) (violation of company policy is a legitimate, non-discriminatory reasons for termination); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998) (violation of company's sexual harassment policy was legitimate, non-discriminatory reason for terminating plaintiffs).

Plaintiff emphasizes that she has repeatedly denied using a racial slur against Malloy. [See Dkt. 85 at 9.] But her denial does not create a material factual dispute. The question is not whether Plaintiff did, in fact use a racial slur, but whether Ford honestly believed that she used a racial slur. See *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015) ("[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision" (internal citation and quotation marks omitted)); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003) ("[i]t was up to Adams to produce evidence showing that Wal-Mart did not genuinely believe that she had" stolen the money—not simply that the "investigators might have made a mistake in their conclusion"). It is undisputed that the decisionmaker in this case, Bryant, relied upon several witness statements reporting that Plaintiff had used a racial slur. There is no evidence that in doing so she was being dishonest. [See Dkt. 85-2, ¶¶ 34-37.] See also *Liu v. Cook County*, 817 F.3d 307, 318 (7th Cir. 2016) ("But the pretext inquiry turns on honesty, not correctness, and

even if we assume a less severe punishment might have been more appropriate, that fact does not, without more, provide evidence of pretext.").[5]

All of these facts point to the conclusion that Plaintiff was not meeting Ford's legitimate job expectations.[6] This is not the end of the Court's inquiry, however. In this case the second element of the *prima facie* case, whether Plaintiff was performing satisfactorily, "merges into the fourth element," whether Ford treated Plaintiff "worse

---

[5]     In an employment discrimination case, a plaintiff "may prevail—even without showing that the ultimate decisionmaker harbored discriminatory bias—by invoking the cat's paw theory of liability." *Sinha v. Bradley University*, 995 F.3d 568, 573 (7th Cir. 2021); see also *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011); *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007). Under this theory, "where an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her 'singular influence' over an employee who does have such power to harm the plaintiff for [gender-based] reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII." *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007). However, "[a]n employer may avoid cat's-paw liability if 'the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision.'" *Sinha*, 995 F.3d at 574 (quoting *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019)). "So long as 'the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action ... the employer will not be liable.'" *Id.* (quoting *Staub*, 562 U.S. at 421). Plaintiff has not asserted a cat's paw theory of liability and the undisputed evidence in the record does not support one. Even if the Court assumes that Malloy harbored discriminatory animus toward Plaintiff because of her sex, Bryant conducted her own investigation and Bryant did not simply rely on Malloy's (or Malloy's girlfriend's) claim that Plaintiff used a racial slur. Bryant also interviewed third-party witnesses, who also reported use of the slur. [See Dkt. 85-2, ¶¶36, 37.] Plaintiff does not claim that these witnesses harbored any bias.

[6]     Plaintiff's counsel objects to the Court considering those parts of Plaintiff's deposition testimony where she testified about her understanding of Ford's disciplinary policies, arguing that Plaintiff's beliefs are not relevant to whether Ford discriminated against her. [See Dkt. 85-2, ¶¶ 56-59.] For example, Plaintiff acknowledged that termination would be an appropriate discipline for calling Malloy the n-word (as well as for calling him a "bitch" and "asshole," as she admits to doing). [See Dkt. 85-2, ¶¶ 57-58 (citing Dkt. 78-7 at 30 (Tr. 102:7-18).] She acknowledged that, considering the witness statements obtained during the investigation, some form of discipline was warranted. She understood why Ford concluded that she violated the Anti-Harassment Policy, and agreed that was "a reasonable conclusion to draw." [Dkt. 78-7 at 43 (Tr. 146:2-15).] Even without this testimony, Plaintiff fails to establish the second element of her *prima facie* case.

than a similarly situated co-worker." *Luster v. Ill. Dep't of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). "Federal employment discrimination laws do not limit their protection to perfect or even good employees"; they also "protect employees who misbehave or perform poorly." *Id*. Thus, under Title VII, "an employer cannot intentionally discipline poor employees more severely on the basis of race, sex, religion, or national origin." *Id*.

Plaintiff points to the fact that Malloy was not terminated even after repeatedly engaging in more serious misconduct than Plaintiff. The parties disagree on whether Malloy is a proper comparator for purposes of the *McDonnell Douglas* analysis. "To determine whether employees are similarly situated, courts ask 'whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis.'" *de Lima Silva v. Dep't of Corrections*, 917 F.3d 546, 559 (7th Cir. 2019) (quoting *Luster*, 652 F.3d at 730). While they need not be identical in every way, similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects.'" *Skiba v. Illinois Central R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018). "In the usual case a plaintiff must show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McDaniel*, 940 F.3d at 369 (quoting *Coleman*, 667 F.3d at 847). In cases like this one, where the plaintiff alleges that the employer disciplined her

more harshly than her comparator, "'the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor,' rather than job description and duties." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)).

Plaintiff argues that she and Malloy are similarly situated because they were both hourly employees; they were both disciplined by the same labor relations personnel; and "both argued with each other while using profanity." [Dkt. 85 at 8.] Plaintiff further argues that Malloy's misconduct was much more egregious than hers because he had engaged in similar misconduct ten days earlier and "was the aggressor in both circumstances where he accosted the women he worked with, as well as threatened physical harm and termination of their employment." [*Id.*]

Ford responds that Plaintiff and Malloy are not similarly situated, for two primary reasons. First, Ford argues that Plaintiff and Malloy did not engage in similar misconduct. Plaintiff, but not Malloy, was found to have used a racial slur and none of Malloy's prior offenses were for violations of Ford's Anti-Harassment Policy. [See Dkt. 90 at 12.] The Court agrees with Plaintiff that Ford takes an overly narrow view of the employees' alleged misconduct. Similarly situated employees must be "directly comparable to the plaintiff in all *material* respects," but they "need not be identical in every conceivable way." *Marnocha v. St. Vincent Hospital & Health Care Center, Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman*, 667 F.3d at 846; internal quotation marks omitted; emphasis added). "'[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they

16

have engaged in conduct of comparable seriousness.'" *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (quoting *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007)). Based on the summary judgment record, the Court cannot say that no reasonable juror could find Plaintiff's and Malloy's misconduct of comparable seriousness (or Malloy's misconduct more serious than Plaintiff's). Malloy is not alleged to have used the n-word, like Plaintiff, but Ford determined that he called his female co-workers "bitches" and threatened to slap them on at least two occasions. See *Dunlevy*, 52 F.4th at 355 (it was question of fact for the jury whether co-worker's "tardiness and absences [were] of comparable seriousness" to plaintiff's falsification of meter readings for purposes of *McDonnell Douglas* burden-shifting framework).

Ford's second argument, however, is more convincing. Ford emphasizes that Plaintiff and Malloy held different job classifications under the collective bargaining agreements and therefore were not subject to the same standards of discipline. In its opening brief [Dkt. 76 at 10], Ford cites a number of cases in which the plaintiff's proposed comparator was found at summary judgment not to be similarly situated to the plaintiff due to differences in employment status and seniority. See *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1062 (7th Cir. 2008) ("differences in seniority will tend to make two employees dissimilar for purposes of the plaintiff's prima facie case" (citing *Doe v. First Nat. Bank of Chicago,* 865 F.2d 864, 877 (7th Cir. 1989)); *O'Neal v. Shinseki*, 2015 WL 1396375, at *8 (N.D. Ill. Mar. 24, 2015) ("Probationary employees and non-probationary employees are not similarly situated

for purposes" of the *McDonnell Douglas* analysis); *Marshall v. Winpak Heat Seal Corp.*, 2010 WL 1433374, at *4–5 (C.D. Ill. Apr. 8, 2010) (plaintiff, a probationary employee, was not similarly situated to non-probationary employees, where there was "uncontroverted evidence that probationary employees were held to a higher standard than non-probationary employees regarding compliance with work rules and expectations" and non-probationary employees were entitled to the protections of progressive discipline and for-cause termination); *Joiner v. Merrillville Community School Corp.,* 2008 WL 151327, *20 (N.D. Ind. Jan. 11, 2008) (a school principal not similarly situated to school teachers where, among other things, "teachers were subject to a collective bargaining agreement whereas Plaintiff … was not").

Plaintiff does not address this case law in her response, which is fatal to her sex discrimination claim. The Court finds *Steinhauer v. DeGolier*, 359 F.3d 481 (7th Cir. 2004), particularly instructive. In that case, the plaintiff was a male employee who was terminated, in part, for having a private conversation with a female employee. The record showed that the plaintiff's new supervisor was concerned that employees spent too much time chatting. See *id.* at 484-85 & n.2. The male employee argued that he was similarly situated to the female employee, who was not fired for engaging in the same conversation that led to his termination. *Id.* at 484. The Seventh Circuit rejected this argument, concluding that the two employees "were not similarly situated because [the male employee] was still on probation while [the female employee] was not." *Id.* at 484-85 (citing *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000) (probationary state trooper not similarly situated to non-probationary

state trooper); *McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984) (female probationary employee not similarly situated to male permanent employee)). Likewise, in this case, Plaintiff and Malloy cannot be considered similarly situated for purposes of disciplinary action because they held different classifications under the collective bargaining agreements, affording them materially different rights.

Malloy began working at Ford in 2012 and was a full seniority employee at the time of the incident with Plaintiff. Plaintiff was still an STS employee and had been at Ford only three months. It is undisputed that STS employees supplemented the regular vehicle assembly workforce for defined periods of time and did not have the same rights as seniority employees under the collective bargaining agreement. [Dkt. 85-2, ¶ 9.] Most importantly, it is undisputed that STS employees were expected to maintain exemplary behavioral records, and unlike In Progression employees, were subject to termination without following progressive discipline, regardless of the offense. [*Id.*, ¶ 10.][7]

Since Plaintiff and Malloy were subject to different standards, the Court concludes that they cannot be considered similarly situated for purposes of the *McDonnell Douglas* analysis. Malloy is the only comparator that Plaintiff provides. Plaintiff offers no information concerning how Ford treated other STS employees and has made no attempt to show that the punishment she received was harsher than that meted out to male STS employees. As a result, Plaintiff is unable to carry her

---

[7]     Plaintiff contends that she was "not made aware that Ford considered Supplemental employees different than other full-time employees," [Dkt. 85-2, ¶ 9], but she never disputes that Ford does, in fact, consider the two types of employees to be different for purposes of imposing discipline.

burden to establish the second and fourth elements of a *prima facie* case of sex discrimination. See *Ellis,* 650 F.3d at 646 (summary judgment proper where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Ford is entitled to summary judgment on Plaintiff's IHRA sex discrimination claim (Count II).

### 2. *Ortiz*

As an alternative to the *McDonnell Douglas* framework, a plaintiff "may prove discrimination in a holistic fashion, by proffering 'direct or circumstantial evidence of intentional racial discrimination.'" *Wince*, 66 F.4th at 1040 (quoting *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016); see also *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination."). Direct evidence is "what [the employer] said or did in the specific employment decision in question." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005). Circumstantial evidence is "evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Rudin*, 420 F.3d at 720. The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d 923, 929 (7th Cir. 2020). Under *Ortiz*, the Court looks at

all of this evidence together and asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] ... caused the discharge or other adverse employment action" at issue. 834 F.3d at 765; see also *Lewis*, 36 F.4th at 760 (the court assesses the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself).[8]

Plaintiff relies on five pieces of evidence. *First*, Plaintiff argues that the timing of her termination was suspicious, and therefore serves as evidence that Ford acted with discriminatory animus, because it occurred only eight days after she reported the incident to Labor Relations. [See Dkt. 85 at 4-5.] While this timing might support a retaliation claim, Plaintiff fails to explain how it supports her sex discrimination claim. Plaintiff and the Female Co-Worker reported Malloy to Labor Relations, which initiated its investigation in response. See *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008) ("the hallmark of a reasonable corrective action is a prompt investigation").

---

[8]    In addition to using the *McDonnell Douglas* burden shifting method, Plaintiff also assesses the record using the outdated "direct evidence" method. [See Dkt. 85 at 2-3.] Ford refers to the "direct method," too. [See Dkt. 90 at 15-16.] But in *Ortiz*, the Seventh Circuit ordered district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Ortiz*, 834 F.3d at 765. The legal standard is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. The Seventh Circuit emphasized: "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id*. The Seventh Circuit also clarified that its "decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand." *Id*. at 766. Therefore, the Court will analyze Plaintiff's "direct evidence" of discrimination [see Dkt. 85 at 4-7] under *Ortiz*.

*Second*, Plaintiff relies on her testimony that when she spoke with the union representative about the incident, he told her, "if you go up there, it's not going to go how you want it to go." [Dkt. 91-3 at 11 (Tr. 114:3-5).] Plaintiff took this to mean that she might get in trouble for her conduct. [*Id*. (Tr. 114:19-24).] Plaintiff argues that "[t]he union representative was sufficiently familiar with Defendant's workplace culture to know and predict that, not only is discrimination of this nature … omnipresent and pervasive, but that a complaint of discrimination will likely result in adverse consequences for the complainant." [Dkt. 85 at 4.] But the record does not support the argument that Plaintiff has extrapolated from this warning. Plaintiff points to no evidence showing the representative's familiarity with Ford's workplace culture. And her position that Ford has a sexist workplace culture is based not on testimony or any other evidence developed in this case, but on citations to other employment discrimination lawsuits involving Ford (as discussed below).

*Third*, Plaintiff emphasizes Malloy's alleged statement during the altercation that "come March" or "after shutdown," Plaintiff "won't even have a job." [Dkt. [91, ¶ 15.] This statement, alone or with the other evidence in the record, is insufficient to support the conclusion that Ford terminated Plaintiff because of her gender. Plaintiff admits that Malloy had no control over her employment status. [Dkt. 91-3 at 10 (Tr. 113:6-9).] Further, nothing about Malloy's statement suggests that he meant that Plaintiff would be terminated *because* she was a woman. Malloy's references to "come March" and "after shutdown" could have easily been a reference to the fact that

22

Plaintiff was an STS employee, supplementing the regular vehicle assembly workforce for a defined period. [Dkt. 85-2, ¶ 9.]

*Fourth*, Plaintiff points to Malloy's disciplinary history as evidence that male employees "systemically receive better treatment than female employees." [Dkt. 85 at 5.] If Ford truly enforced its anti-harassment policy, Plaintiff says, then "Malloy would have been fired well before he had a chance to harass and threaten his co-workers on December 11th, 2018." [Dkt. 85 at 6.] This argument does not get Plaintiff very far. As explained above, Malloy is not similarly situated to Plaintiff because he was a permanent, In Progression employee rather than an STS employee. Plaintiff also has not demonstrated that Malloy violated the anti-harassment policy. Regardless, Malloy is only one person. Comparing the punishments that Plaintiff and Malloy received tells us nothing about how Ford "systematically" treated males as compared to females. The only other employee detailed in the record is the Female Co-Worker, and she received a significantly lighter penalty than Malloy for her role in the argument. A reasonable juror could not draw any conclusions about purported "systemic" problems at Ford based on such a limited record.

*Finally*, Plaintiff argues that an inference that Ford fired Plaintiff because of her gender is appropriate because "Ford has many suits against it for sexual harassment and discrimination against women." [See Dkt. 85 at 6.] Plaintiff cites to three gender discrimination lawsuits that were filed against Ford between 1999 and 2019, but provides no other information about the cases, nor does she connect them, even circumstantially, to intentional discrimination. This is an underwhelming

23

showing. Many large employers like Ford have likely had multiple employment discrimination lawsuits filed against them. Plaintiff has not attempted to show that the lawsuits against Ford involved the same Ford plant, the same Ford policies, or any factual similarities to this case. See *Johnson v. Franklin Township Community School Corp.*, 2021 WL5505536, at *5 (S.D. Ind. Nov. 24, 2021) (rejecting the relevance of "other lawsuits" and explaining the mere fact that other women claimed discrimination by a school district based on sex is irrelevant and not supportive of pretext.)

Assessing the evidence as a whole, the Court concludes that no reasonable factfinder could conclude that Plaintiff's sex caused her termination. *Ortiz*, 834 F.3d at 765.

### B.    Retaliation (Count III)

Count III of Plaintiff's complaint is for retaliation in violation of the IHRA. IHRA retaliation claims are analyzed using the Title VII framework. See *Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013) (citing *Zaderaka*, 545 N.E.2d at 687). To succeed on a Title VII retaliation claim, a plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). It is undisputed that Plaintiff engaged in protected activity by complaining about Malloy to Labor Relations and that Plaintiff was subjected to a materially adverse employment action when she was terminated.

Therefore, Plaintiff's retaliation claim hinges on causation. Like a Title VII discrimination claim, a Title VII retaliation claim may be proven using the *McDonnell Douglas* burden-shifting method or the *Ortiz* holistic method. See *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

Plaintiff's retaliation claim fails under *McDonnell Douglas* for the same reason as Plaintiff's sex discrimination claim: she lacks evidence that she was performing to Ford's legitimate expectations or that any similarly situated employees outside her protected class were treated more favorably than her.[9]

Plaintiff's retaliation claim fares no better under *Ortiz*. Plaintiff seeks to establish that Ford retaliated against her by relying on the same evidence that she uses to support her sex discrimination claim: 1) her union representative implied that she would regret reporting the incident; 2) "Ford has a history of discriminating against women"; and 3) she was terminated only eight days after she reported the incident to Labor Relations. [Dkt. 85 at 11.] The first two pieces of evidence fail to support Plaintiff's retaliation claim, for the same reasons they fail to support her sex discrimination claim. This leaves only the close timing between her complaint and her termination, which "alone is rarely enough to raise a triable claim of retaliation." *Kotaska v. Federal Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020) (citing *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018)); see also *Walker v. City of Markham*, -- F. Supp. 3d --, 2023 WL 3918965, at *7 (N.D. Ill. June 9, 2023). This is not one such

---

[9] The Court finds it unnecessary to resolve the parties' dispute over whether Malloy *also* engaged in protected activity when he told Labor Relations, during the interview prompted by Plaintiff's complaint, that Plaintiff called him the n-word. [See Dkt. 96 at 14-15; Dkt. 85 at 13.]

25

rare case. The record shows that Plaintiff complained to Labor Relations, which quickly investigated the matter and decided on the appropriate discipline for all three employees who were involved in the argument. On this record, no reasonable factfinder could conclude that Ford terminated Plaintiff for engaging in protected activity. *Ortiz*, 834 F.3d at 765.

## IV.  Conclusion

For these reasons, Ford's motion for summary judgment [Dkt. 75] is granted. Judgment is entered in favor of Ford and against Plaintiff on Counts II and III of Plaintiff's complaint.

Enter: 21-cv-1244
Date:  September 5, 2023

_____
Lindsay C. Jenkins
United States District Judge